Connon, Richard F., J.

INTRODUCTION

Plaintiff Richard C. Holland (“Holland”) filed this suit against the other shareholders of a limited liability company and two close corporations seeking equitable relief and damages for alleged breaches of fiduciary duty in terminating his employment and misappropriating corporate funds. During a jury-waived trial conducted between January 16 and January 23, 2008, Holland stipulated that he would seek damages for only the years 2005 and 2006. This Court took the matter under advisement and now issues the following findings of fact, rulings of law, and order for judgment.

FINDINGS OF FACT

Upon consideration of the credible evidence, and the reasonable inferences to be drawn therefrom, this Court makes the following findings of fact.
Holland has a degree in hotel and restaurant management and worked briefly in that industry before working in finance with several companies including Paine Webber and State Street Global Advisors. In 1999, Holland was employed by Mitchell Hutchins in New York City, where he was making a million dollar salary. Holland decided that he was financially comfortable and retired to Provincetown for a more relaxed lifestyle. Holland obtained a real estate license and worked as a real estate broker in Provincetown.
In 2001, defendants Sean F. Burke (“Burke”) and Phillip E. Mossy (“Mossy”) came to Provincetown to search for space in which to own and operate a restaurant. Mossy had lived in the San Diego area and was part owner/operator of several successful restaurants there. Burke’s background was in the liquor distribution business, and he and Mossy together were part owners / operators of the Bayou Bar and Grill in San Diego. Mossy and Burke learned that the Red Inn on Commercial Street in Provincetown, a dilapidated inn no longer in operation, was for sale.
Defendant David L. Silva (“Silva”), a Provincetown native, was well-known around town and owned and operated Silva’s Seafood Connection, a Provincetown restaurant. Holland, Burke, Mossy, and Silva socialized with the same group of friends in Provincetown. Mossy and Burke decided to place a bid on the Red Inn, and asked Holland whether he would become an investor. Holland asked Silva questions about running a restaurant in Provincetown and told Silva about the availability of the Red Inn. Silva expressed interest in joining the venture, and the four men decided to purchase and renovate the Red Inn together.
Holland worked closely with Lester Murphy, a corporate attorney in Dennis, to create the necessary corporate documents. On December 6, 2001, the four men formed the Red Inn, LLC (“the LLC”) under G.L.c. 156C to own the Red Inn. Holland, Burke, Mossy, and Silva each own a 25% beneficial interest in the LLC. Holland and Silva were the Managers of the LLC.
On December 6, 2001, Holland, Burke, Mossy, and Silva signed an “Operating Agreement” for the LLC. All four men carefully reviewed the Operating Agreement before executing it. Article II, section 2.2 of the Operating Agreement states that the Manager of the LLC
shall serve as such until resignation, death or a judicial adjudication of incompetence, or until seventy percent (70%) of the Members elect a new Manager or Managers at a meeting called by the Members or Manager for such a purpose.
Article III, section 3.2 states that except as otherwise provided in the Operating Agreement, no member shall have the right:
(b) To have his capital contribution repaid except to the extent provided in this Agreement.
(c) To require partition of the Company’s property or to compel any sale or appraisal of the Company’s assets.
*553 (d) To sell or assign his interest in the Company or to constitute the vendee or assignee thereunder, except as provided in this Agreement.
(e) To voluntarily withdraw as a Member from the Company.
Article III, section 3.6 further provides:
No Member may terminate his membership in the Company or have any right to distributions respecting his membership interest (upon withdrawal or resignation from the Company or otherwise) except as expressly set forth herein. No Member shall have the right to demand or receive property other than cash in return for such Member’s contribution.
Article V, section 5.1(b) provides:
Except as otherwise provided in this Section 5, no Member shall be obligated or permitted to contribute any additional capital to the Company. No interest shall accrue on any contributions to the capital of the Company, and no Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any other payment in respect of its interest in the Company, including without limitation as a result of the withdrawal or resignation of such Member from the Company, except as specifically provided in this Agreement.
Article V, section 5.2 of the Operating Agreement provides:
The contribution of each Member is to be returned to such member only upon the termination and liquidation of the Company, but contributions may be returned prior to such time if agreed upon by all Members.
Article VII, section 7.1 provides in relevant part:
No Member may sell, assign, give, pledge, hypoth-ecate, encumber or transfer . . . such Member’s interest in the Company or any part thereof, unless said Member delivers an offer of sale of interest to the Company at least sixty (60) days prior to said Member’s prospective disposition of his interest in the Company for liquidation by it at the then fair value of said Member’s contribution of property or service to the Company (the “Offer”). The Offer shall state the name and address of the proposed transferee and the price or consideration, if any to be paid by such transferee . . .
Section 7.1 gives the LLC the right, within 20 days after notice of the Offer, to elect to purchase the member’s interest at a purchase price set forth in section 7.2:
the lesser of (a) the price therefor that the Member has been offered or has offered, or (b) the amount of cash and/or the value of the property and/or services contributed by the Member to the Company as reflected in said Member’s capital contribution of Exhibit A hereto.
Section 7.3 states that if the parties cannot agree on a purchase price under Section 7.2, the Company shall elect and pay an independent business appraiser to appraise the value of the Member’s capital contribution, and that appraisal will be binding. Under Section 7.5, if the Company does not elect to purchase the Member’s interest, the Member may transfer it to the individual named in the Offer, but that individual cannot become a Member of the LLC unless 70% of the other Members consent.
The LLC purchased the Red Inn on December 20, 2001. The purchase price was $2.4 million because of its prime waterfront location. Holland, Burke, Mossy, and Silva each contributed $185,000 to acquire the Red Inn, with $15,000.00 from each party set aside for renovations. The remainder of the financing came from Seaman’s Bank, with personal guarantees from each of the four men.
The parties formed the Red Inn of Provincetown, Inc. under Chapter 156B to operate the Red Inn and the Red Inn Restaurant. Each of the four men is a 25% stockholder in that corporation. Holland was named the President and Treasurer, while Silva was named the Clerk. Holland, Burke, Mossy, and Silva are each directors of the corporation. The Red Inn of Province-town, Inc. is a tenant of the LLC and pays rent.
The parties worked hard to prepare the Red Inn for opening in the spring of 2002. All of the parties had something to offer by way of their talents and background. Burke set up the dining room, worked as a chef, and created a business model. Holland engaged a contractor for the renovations and was responsible for advertising, marketing, and public relations. Little to no compensation was paid during this period of renovations. After substantial effort by all, the Red Inn opened in April of 2002, with a grand kickoff on May 2, 2002.
It was understood and agreed that all four men would work at the Red Inn full time in different capacities. Mossy was the executive chef, in charge of the kitchen, Burke was in charge of the bar, Silva helped out in the kitchen, and Holland managed the finances. None of the four had employment contracts and all were employees-at-will. The first year in operation was better than expected and toward the end of the season each party took a weekly salary of $250. The Inn was closed for the winter season and during the first three months of 2003, the parties made additional renovations to the premises. Also during the winter of 2003, Holland, Burke, Mossy, and Silva traveled together to Puerto Vallarta, Mexico for a month. Holland wrote the deposit check for the trip from the LLC’s account. During this retreat, Mossy explored local restaurants to obtain ideas to improve the Red Inn’s kitchen.
The Red Inn re-opened in the spring of 2003 and once again the business exceeded expectations and the parties were able to take out $500 per week. While *554 working at the Red Inn, all four owners provided free meals and drinks to their friends. Toward the end of the 2003 season, the parties became aware that the Anchor Inn, also located in Provincetown, was up for sale. During the winter of 2004, Holland, Burke, Mossy, and Silva again traveled to Puerto Vallarta, Mexico, and Holland prepared and signed the deposit check for this trip from corporate funds. While in Mexico, the four discussed the possible purchase of the Anchor Inn. On May 19, 2004, the LLC purchased the Anchor Inn for $4.5 million, with $1.5 million financed by the Cape Cod Cooperative Bank, $2.5 million from the seller, $50,000 cash from Mossy, $50,000 cash from Burke, and $150,000.00 from Burke’s mother. All four men signed personal guarantees for the loans. The parties formed a new corporation, 175 Commercial Street, Inc., to operate the Anchor Inn. Holland, Burke, Mossy, and Silva each owned 25% of the stock of this new corporation, and each was a director. Holland was the President and Treasurer of this corporation. 175 Commercial Street, Inc. is a tenant of the LLC and pays rent.
The Anchor Inn was in good condition and required no renovations. In the spring of2004, Holland became the manager of the Anchor Inn and had primary responsibility for its operation.
The other shareholders, save Silva, worked primarily at the Red Inn but also worked shifts at the Anchor Inn. None of them took a salary from the Anchor Inn, although from May through November, the Anchor Inn was financially successful. The four men decided to travel to Mexico for the upcoming winter, and Holland submitted a deposit check on behalf of the LLC.
During the summer of 2004, Holland complained to various individuals that he was increasingly unhappy working in the businesses. Holland was becoming dissatisfied with his relationship with the remaining stockholders. Employees were complaining to him that the other shareholders were taking food and liquor from the Red Inn, guests were being treated rudely, and Burke, Mossy, and Silva were not working their assigned hours. Holland was an articulate and principled individual who had a different philosophy on how a business should be run. He was at odds with the other shareholders with respect to company sponsored trips to Mexico, inattention and accountability issues, and a general overall distaste for the others’ collective approach to running a business.
As a result of this dissatisfaction, on October 1, 2004, Holland presented to Burke, Mossy, and Silva a document prepared by him entitled, “Departure and Future Strategies” which contained four alternative proposals. One proposal was that the other shareholders would purchase Holland’s interests. In addition to some calculations on values less liabilities, Holland proposed that he would surrender all of his shares for a total price of $750,000. He suggested that this amount could be obtained from a new member or $250,000 each from Burke, Mossy, and Silva. The second proposal was that the Red Inn and the Anchor Inn would be valued, split, and owned separately. The third proposal was that Holland would purchase the other shareholders’ interests. The final proposal was that the LLC (parent of both the Red Inn and the Anchor Inn) would continue to own both companies with member percentages intact and unchanged, but definitive operating agreements would be created for each individual company and include specific enforceable duties and responsibilities for each of the four shareholders. In addition, a predetermined percentage of operating revenues would be paid to the LLC with failure to meet predetermined revenue triggering enforceable financial and managerial penalties.
Burke, Mossy, and Silva did not agree to any of the four proposals, which they believed did not comply with the Operating Agreement. In addition, they did not have enough capital to purchase Holland’s shares and did not want to split the two businesses up. In response to this impasse, Holland cancelled the LLC’s credit cards, which the LLC used to purchase goods and services. Holland also wrote himself a check from LLC funds in the amount of one-quarter of the cost of the upcoming Mexico trip. Burke, Mossy, and Silva contacted Attorney Lester Murphy about the proper way to end Holland’s employment and day-to-day responsibilities. Attorney Murphy stated that he could no longer represent the corporations because Holland had already contacted him about LLC issues. The three men then contacted another attorney, Robin Reid, for assistance.
Silva as clerk called special meetings of the LLC and of the shareholders and directors of the two corporations for November 4, 2004. The meetings began at 4:15 p.m. and lasted only approximately 40 minutes. At these meetings, which Holland attended, the other shareholders voted to remove Holland as a Director, Manager and President and Treasurer of the operating corporations. Holland, of course, dissented from these votes. Holland was asked to turn over his keys to the Red Inn and the Anchor Inn and to stay away from the properties. Holland continued to receive $500 per week until the end of the year, and his health insurance was continued until March of 2006.
Holland still retains his 25% interest in the LLC and the operating corporations. None of the entities has ever declared dividends.
After his termination, Holland took odd jobs around Provincetown until January 15, 2007, when he moved away. In February of 2007, Holland landed a job as a senior portfolio strategist with the State Street Bank in Boston, earning a base salary of $135,000. Despite the disagreements among the four shareholders, the businesses prospered and the Red Inn received grand reviews from Boston Magazine as “The best fish on Cape Cod.” The businesses did exceptionally well in 2005 and 2006 and continue to do well to the present.
*555 Holland filed this action against his fellow shareholders on March 4, 2005. Although the Amended Complaint asserts seven counts, Holland withdrew Counts II, III, and IV prior to opening statements.[2] Count I of the Amended Complaint seeks declaratory relief that Holland was unlawfully removed as President, Director, Manager and Treasurer of the LLC and as an officer and director of the Red Inn of Province-town, Inc. and 175 Commercial Street, Inc. Count V alleges that the defendants breached their fiduciary duty to Holland by the defalcation of funds and the misuse of corporate credit cards. The next Count[3] alleges that the defendants improperly removed Holland from participation in and management of the businesses. Count VI seeks equitable relief to permit Holland to participate in the business of the Red Inn and Anchor Inn. Finally, Count VII seeks an accounting of the gross receipts, expenses, liabilities, and distribution of earnings of the two corporations and LLC.
Aside from the unlawful discharge as manager, the bulk of Holland’s claims are based upon his suspicions that something was amiss at the time of his separation. Since then, his claims have expanded as a result of a review of the tax returns by William E. Philbrick (“Philbrick”), a CPA hired by Holland to determine shareholders’ compensation and benefits for the years 2005 and 2006. Philbrick was employed by the Internal Revenue Service for approximately 19 years, during which time he was a Field Examiner, conducting fraud investigations primarily in the area of restaurant and retail operations. For the past several years, he has been a Senior Vice President of a Worcester accounting firm. Philbrick reviewed all of the Federal and State tax returns for the Red Inn and Anchor Inn for the years 2001 through 2006, and Federal and State Partnership returns for the same period. In addition, he was furnished with Meals and Beverage tax returns for the years 2005 and 2006, as well as 2007, which is beyond the scope of Holland’s claims. These are but a few of the reviewed documents that are contained in Philbrick’s report appendix E.
The report submitted by Philbrick involved the review of not only substantial documentation from the LLC and corporations but also the hotel and restaurant industry and the local economy. Philbrick used an indirect method rather than an objective method to determine corporate income. Philbrick’s methodology was to assess the corporate documents with reference to background industry information, industry trends, information specific to Cape Cod, and information specific to fine dining. The corporate records made available to Philbrick were compared to public records which are all contained in Appendix C of Philbrick’s report. From this comparison, Philbrick concluded that the “cash receipts” from the businesses may have been understated. Philbrick assumed that because there was no excess cash reported on the balance sheet, the defendant shareholders shared equally in any additional receipts. Philbrick determined from the 2006 tax returns for the Anchor Inn that the benefits received by the three shareholders totaled $77,726, which included compensation, travel and entertainment expenses. He thus calculated benefits of $25,908 for each shareholder except Holland. For the year 2005, the benefits received by the three shareholders totaled $22,127, with each defendant shareholder receiving $7,375.66 in compensation. To come up with an occupancy rate for the Anchor Inn for years 2005 and 2006, Philbrick examined the total reported income from the tax returns. Philbrick compared the 2005 and 2006 occupancy rates of the Anchor Inn against the 2005 and 2006 Barnstable County occupancy rates and then adjusted the reported rental income from $748,908 to $1,001,080 for 2005 and from $730,949 to $968,144 for 2006. Philbrick compared the reported meals tax return showing 97.92% credit card sales to industry studies showing credit card use of 75.8%, and then adjusted the additional income from 2005 cash sales to $436,112 and the 2006 cash sales to $350,077. Based on the fact that a total of $4,200,000 in loans is guaranteed by each of the four shareholders, and the assumption that Holland would be the first guarantor a bank would go after because he was the “pivotal person” who secured the loans, Philbrick determined that Holland was entitled to compensation of 2% of the guaranteed amount, or $84,000 per year for 2005 and 2006, totaling $168,000, the cost of a letter of credit. Ultimately, Philbrick concluded that Holland is entitled to additional shareholder compensation and benefits for the years 2005 and 2006 totaling $763,255.

RULINGS OF LAW

It is undisputed that Red Inn of Provincetown, Inc. and 175 Commercial Street, Inc. are close corporations under Massachusetts law. A close corporation is defined as one which has a small number of stockholders, no ready market for its stock, and substantial majority stockholder participation in the management, direction, and operations of the corporation. Harrison v. NetCentric Corp., 433 Mass. 465, 469 n.6 (2001); Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 586 (1975). Shareholders in a close corporation owe one another a fiduciary duty of utmost good faith and fair dealing in the operation of the enterprise. Brodie v. Jordan, 447 Mass. 866, 869 (2006); Demoulas v. Demoulas, 428 Mass. 555, 578 (1998); Donahue v. Rodd Electrotype Co. of New England, 367 Mass. at 587. Despite the existence of this duty, the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation. Merola v. Exergen Corp., 423 Mass. 461, 466 (1996). The determination of whether the majority has breached its fiduciary duly to the minority is a matter of law for the court, as is the appropriate remedy for any breach. Id. at 464.

*556
Removal of Holland as Officer and Director

Count I of the Amended Complaint seeks declaratory relief that Holland was unlawfully removed as President, Director, Manager and Treasurer of the LLC and as an officer and director of the Red Inn of Provincetown, Inc. and 175 Commercial Street, Inc. The second Count V alleges that the defendants breached their fiduciary duty to Holland by improperly removing him from these positions. Count VII seeks equitable relief to allow him to participate in the business operations of the two inns. In essence, Holland alleges that Burke, Mossy, and Silva have frozen him out of the LLC and operating corporations.
The majority interests in a close corporation must have a large measure of discretion with respect to corporate governance, including the declaration or withholding of dividends, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees. Merola v. Exergen Corp., 423 Mass. at 464; Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 851 (1976). Nonetheless, the majority’s discretion to make corporate decisions is restrained by the fiduciary duly of utmost good faith and loyalty owed by all stockholders in a close corporation to one another, and the majority cannot employ oppressive devices to “freeze out” the minority by frustrating the minority’s reasonable expectation of benefit from their ownership of shares. Brodie v. Jordan, 447 Mass. at 869; Donahue v. Rodd Electrotype Co. of New England, 367 Mass. at 588-89.
Where a corporation uses employee salaries as the primary method of distributing the available corporate earnings, a freeze out may be accomplished by depriving minority stockholders of corporate offices and employment by the company. Brodie v. Jordan, 447 Mass. at 869; Merola v. Exergen Corp., 423 Mass. at 464. Whether there is a freeze out in this situation depends on the shareholders’ reasonable expectations of benefit. Brodie v. Jordan, 447 Mass. at 869-70. Here, Holland has not established that he had a reasonable expectation of continued employment with the Red Inn and Anchor Inn, that a guaranty of employment was a major reason for his investment of capital, or that he was relying on employment by the LLC and two corporations for his livelihood. Cf. Wilkes v. Springside Nursing Home, Inc., 370 Mass. at 849; Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. at 591. In contrast to his co-venturers, Holland lacked significant experience in the restaurant and hospitality industiy, and was financially secure enough to have retired from his career in finance. The evidence at trial did not demonstrate that Holland was relying on a salary as manager and officer as the principal return on his investment, and the salaries taken by the parties were minimal. See Merola v. Exergen Corp., 423 Mass. at 464. Cf. Wilkes v. Springside Nursing Home, Inc., 370 Mass. at 850. Rather, the credible evidence established that Holland’s primary motivation in joining the enterprise was to invest in the land and the two businesses, an interest which Holland retains by virtue of his stock ownership. Moreover, Holland had repeatedly expressed dissatisfaction with working long hours at low wages in the day-to-day operation of the inns. Accordingly, Holland has not proven an improper freeze out based on his termination as a manager and officer.
Holland also complains that the majority improperly froze him out by terminating him as a director of the operating companies. A freeze out may occur when the majority injures a minority shareholder’s non-economic interests in management of the enterprise and corporate decision-making by removing him as officer or director. Brodie v. Jordan, 447 Mass. at 870; Wilkes v. Springside Nursing Home, Inc., 370 Mass. at 850. However, it is not sufficient for a party challenging a corporate action to merely label it a “freeze out.” Leader v. Hycor, Inc., 395 Mass. 215, 221 (1985). Freeze-outs, by definition, are coercive and manifestly inequitable. Id. Courts must ensure that application of the strict fiduciary duty standard does not impose limitations on legitimate action by the controlling group which will unduly hamper its effectiveness in managing the corporation. See Wilkes v. Springside Nursing Home, Inc., 370 Mass. at 850. The majority has certain rights to selfish ownership of a close corporation which must be balanced against their fiduciary duty to the minority. Id. at 851. Thus, when a minority shareholder alleges a breach of fiduciary duty by the controlling majority, the court must examine whether the controlling group can demonstrate a legitimate business purpose for their actions. Leader v. Hycor, Inc., 395 Mass. at 222; Wilkes v. Springside Nursing Home, Inc., 370 Mass. at 851-52. Once the majority advances such a purpose, the complaining shareholder must establish that the same legitimate objective could have been achieved though an alternative course of action less harmful to the minority’s interests. Id. The court should then weigh the legitimate business purpose against the practicability of a less harmful alternative. Id.
Here, Holland invested his capital and time in the LLC and operating corporations with the expectation that he would continue to participate in corporate decisions. Nonetheless, there was a legitimate business purpose for removing Holland as a director and officer: to preserve and continue the successful operation of the Red Inn and Anchor Inn. The credible evidence established a breakdown over time of the relationship between Holland on the one hand and the other three shareholders with respect to the day-today operations of the two inns and the long-term goal of the venture. Holland proposed to resolve this problem by essentially dividing and selling the businesses in order to recapture his investment, whereas Burke, Mossy, and Silva were dedicated to the continued operation of the inns. Thus, there was a legitimate *557 business purpose for removing Holland. Holland has not demonstrated that the same objective practicably could have been achieved through an alternative course of action less harmful to his interests. The majority shareholders were not required to accept any of the four alternative proposals contained in Holland’s “Departure and Future Strategies.” It is clear that they could not afford to purchase Holland’s interests, nor did they wish to have Holland buy them out of the businesses they had created and built, or split the two inns into separate ownership.
Further, the defendants’ vote to terminate Holland as a manager, director, and officer was in accordance with the terms of the Operating Agreement and the operating documents of the two corporations. In contrast, Holland’s proposals for his departure conflicted with the terms of the Operating Agreement, which gives members veiy limited rights to transfer their interests or withdraw their capital from the venture.
Finally, Holland’s termination does not appear to have been motivated by a desire on the part of Burke, Mossy, and Silva to gain financially at Holland’s expense. See Merola v. Exergen Corp., 423 Mass. at 461. Nor was the majority's primary motive to prevent Holland from continuing to receive money from the corporations. Cf. Wilkes v. Springside Nursing Home, Inc., 370 Mass. at 847. There is no evidence that the majority’s management of the enterprise is such as to place Holland at risk on his personal loan guaranties. Thus, Holland has not demonstrated that the majority's conduct was coercive and manifestly inequitable so as to deprive him of his interest in the corporations or frustrate his purpose in entering into the corporate venture. Cf. Bodio v. Ellis, 401 Mass. 1, 9-10 (1987) (shareholder/director’s acquisition of additional stock in order to force another shareholder/director to retire was a freeze out which breached fiduciary duty and warranted equitable relief, where the two shareholders at all times had expectation of equal control); Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. at 598-600 (improper “freeze out” occurred where majority deprived the minority of equal opportunity to have its stock repurchased by the corporation); Crowley v. Communications for Hosp., Inc., 30 Mass.App.Ct. 751, 762, rev. den., 410 Mass. 1104 (1991) (majority froze out minority stockholder by paying themselves excessive compensation, refusing to declare dividends, failing to redeem minority shares on same basis as was available to the majority, and attempting to purchase minority shares at bargain price).
For all these reasons, Holland has not established that his termination as manager, director, officer, and/or employee of the LLC and the operating corporations constituted a breach of fiduciary duty. The defendants are thus entitled to judgment in their favor on Count I, the second Count V, and Count VI of the Amended Complaint.

Misappropriation of Corporate Sums

The first Count V alleges that the defendants breached their fiduciary duty to Holland by diverting large amounts of money from the corporation, making improper use of corporate credit cards, and failing to make distributions to him. The directors, officers, and controlling shareholders of a close corporation are charged with a paramount duty of loyalty. Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 528-29 (1997). They are bound to act with absolute fidelity and may not act out of avarice, expediency, or self-interest in derogation of their duty of loyalty to the corporation and to the other shareholders. Id. at 528; Donahue v. Rodd Electrotype Co. of New England, 367 Mass. at 593. They must subordinate their personal pecuniary interests to their fiduciary duty, and must refrain from promoting their own interests in a manner injurious to the corporation. Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. at 594; Geller v. Allied-Lyons PLC, 42 Mass.App.Ct. 120, 122 (1997).
The diversion of corporate funds for personal use is a breach of the fiduciary duty of loyalty. Allied Freightways, Inc. v. Cholfin, 325 Mass. 630, 631 (1950). Holland alleges in the Amended Complaint that Burke, Mossy, and Silva have misappropriated huge sums of money from the operation of the inns, hoarded cash in a safe rather than depositing it in the LLC’s account, and distributed the cash amongst themselves without making any distribution to him. These allegations in essence assert a claim of conversion of corporate funds. Conversion is an intentional and wrongful exercise of ownership, control, or dominion over personal property to which one has no right of possession, in a manner inconsistent with the rights of one who has a present entitlement to possession. Abington National Bank v. Ashwood Homes, Inc., 19 Mass.App. 503, 507 (1985). Holland has failed to prove by a preponderance of the credible evidence any misappropriation or conversion of corporate funds.
Holland testified that he has no direct evidence of conversion, but suspects that it has occurred. His expert, Phillbrick, also admitted that there is no direct evidence of conversion and that he lacked sufficient documents to draw an expert conclusion. Nonetheless, Philbrick used extrapolations from corporate documents and industry surveys to conclude that for calendar years 2005 and 2006, the LLC under-reported over $1,700,000 in income, approximately 50% of the LLC’s total income. Holland thus alleges that this income was converted by the defendants. This Court does not find competent or credible Philbrick’s analysis and conclusions as to under-reporting, and does not credit Philbrick’s testimony about Holland’s alleged damages. Cf. Van Brode Group v. Bowdiieh & Dewey, 36 Mass.App.Ct 509, 520-21, rev. den., 418 Mass. 1105 (1994) (in breach of fiduciary duly action, court has discretion to exclude expert opinion about damages where opinion appears speculative and based on insufficient evidentiary foundation).
*558 For example, in drawing his conclusion that the inns understated their occupancy, Philbrick relied heavily on a Barnstable County tourism survey but was unable to testify as to the methods by which the survey data was gathered, whether the survey segregated seasonal establishments such as the Red Inn and Anchor Inn from those open all year, and whether the survey segregated establishments for occupancy by category (inn, hotel, or motel) or price per room. In concluding that the Red Inn under-reported cash income from the restaurant, Philbrick relied on a National Restaurant Association Survey which stated that in fine dining establishments such as the Red Inn, 80% of all meals are paid by credit card. Although Philbrick purported to rely on the LLC’s meal tax returns, those returns do not segregate credit card and cash, and he failed to perform either a vertical or a horizontal analysis of those returns and other available financial information. Further, Philbrick failed to take into account that restaurant receipts often include gratuities to wait staff and bartenders in amounts between 15 and 20% of the bill, which is paid out in cash on a nightly basis. For all these reasons, this Court does not find Philbrick’s analysis to be reliable and does not credit his conclusions as to under-reporting. This Court found more credible Silva’s records and testimony concerning the inns’ occupancy, restaurant receipts, and income. This Court concludes that Holland has failed to prove by a preponderance of the evidence any misappropriation or conversion of funds by the defendants.
Holland further alleges in the Amended Complaint that Burke, Mossy, and Silva have improperly used business credits cards for personal vacation, travel, and expense purposes and have not properly accounted for this use. However, Holland simply failed to introduce at trial any credible evidence of misuse of corporate credit cards or funds. To the extent that Holland challenges the trips to Mexico, the credible evidence established that such trips were largely in the nature of business retreats, and Holland himself wrote the checks for and was a willing participant in these annual trips until his relations with the others soured. Holland has not established by the preponderance of the credible evidence any breach of fiduciary duty from the misuse of corporate credit cards or funds. Accordingly, the defendants are entitled to judgment on Count V alleging a breach of fiduciary duty based on the misappropriation or misuse of corporate funds.

Accounting

Finally, in Count VII of the Amended Complaint, Holland demands an accounting of all gross receipts, money paid for expenses and liabilities, and distribution of earnings for the LLC, the Red Inn of Province-town, Inc., and 175 Commercial Street, Inc. Equitable relief in the nature of an accounting is available where there is a fiduciary relationship between the parties and damages are due one of the parties following a fiduciary breach or fraud. See Ball v. Harrison, 314 Mass. 390, 392 (1943); Milbank v. J.C. Littlefield, Inc., 310 Mass. 55, 61 (1941); Craine v. Royster, 255 Mass. 118, 120 (1926). Here, Holland failed to prove any breach of fiduciary duly by the defendants which would entitle him to the remedy of an equitable accounting. In any event, Article II, section 2.4(c) of the Operating Agreement of the LLC allows any member to obtain an audit or review of the LLC’s books by a certified public accountant of his choice at his own expense. To the extent that Holland has concerns about the LLC’s finances, he can avail himself of that contractual remedy.
Holland’s Motion for Assessment of Attorneys Fees
Holland has filed a motion for assessment of attorneys fees and costs incurred in this litigation and has attached detailed billing records in support. Attorneys fees may be awarded, in the court’s discretion, to a party who has successfully brought a derivative action on behalf of a corporation. Martin v. F.S. Payne Co., 409 Mass. 753, 759 (1991); Coggins v. New England Patriots Football Club, Inc., 406 Mass. 666, 669 (1990). Such an award is paid from whatever proceeds of the action the corporation receives, and the rationale for the award is that one shareholder ought not bear the expense of a suit which benefits all the shareholders. Shaw v. Harding, 306 Mass. 441, 450 (1940). Where, as here, a plaintiff shareholder brings suit to recover directly on a personal claim, an award of attorneys fees is not appropriate. See Coggins v. New England Patriots Football Club, Inc., 406 Mass. at 670; Sugarman v. Sugarman, 797 F.2d 3, 15 (1st Cir. 1986) (applying Mass. law to minority shareholders’ freeze-out claim). Moreover, because Holland did not prevail on any of his claims, he would not be entitled to recover the fees and costs incurred in this litigation in any event.

ORDER FOR JUDGMENT

For the foregoing reasons, it is hereby ORDERED that judgment enter in favor of defendants Sean Burke, David L. Silva, Philip E. Mossy, Jr., The Red Inn LLC, The Red Inn of Provincetown, Inc., and 175 Commercial Street, Inc. on all counts of the Amended Complaint. With respect to Count I of the Amended Complaint, it is hereby DECLARED and ADJUDGED that plaintiff Richard C. Holland was not unlawfully removed as a manager, officer, director and/or employee of the Red Inn, LLC, The Red Inn of Province-town, Inc., and 175 Commercial Street, Inc.
It is further ORDERED that the Plaintiff s Motion for Assessment of Attorneys Fees be DENIED.

Count II sought the dissolution of the Red Inn LLC pursuant to G.L.c. 156, §§44-46; Count III sought the dissolution of The Red Inn of Provincetown, Inc. pursuant to G.L.c. 156B; and Count IV sought the dissolution of 175 Commercial Street, Inc. pursuant to G.L.c. 156B.

This Count is mistakenly labeled in the Amended Complaint as a second Count V.