Troy, Paul E., J.
*405 INTRODUCTION
This action arises from compensation paid to the defendants in connection with the sale of a significant portion of the assets of J.L. Hammett Company (“Hammett”). The plaintiffs brought suit on behalf of the estates of two Hammett shareholders, George Clay (“Clay”) and Judy Bartos (“Bartos”).[4] The plaintiffs maintain that this compensation was improperly paid to the defendants and served to diminish the plaintiffs’ interest in Hammett. They assert claims against the defendants for breach of fiduciaiy duty based on those awards of compensation. Before the court is the Motion for Summaiy Judgment of defendants Richmond Holden, Jeffrey Holden, Carl Olson, and Alvin Dubin. For the reasons that follow, that motion will be allowed.
BACKGROUND
The following facts are taken from the summaiy judgment record. Hammett is a close corporation that has been involved in the school supply business for over 100 years. The defendants are officers and directors of Hammett. Richmond Y. Holden (“Richmond”) was, at all relevant times, president, chief executive officer, treasurer, and a director of Hammett. Jeffrey Holden (“Jeffrey”) was, at all relevant times, a director and vice president of sales and marketing. Carl E. Olson (“Olson”) was, at all relevant times, an employee and director of Hammett. Alvin Dubin (“Dubin”) was, at all relevant times, the chief financial officer of Hammett.
Clay and Bartos each owned 11,901 shares of Hammett’s common stock. Bartos owned another 1,931 voting shares that were held in trust. Upon Clay’s death in 2004, his shares transferred to his estate, which is administered by Rick Clay. Upon Bartos’s death in 2008, her shares transferred to her husband, Paul A. Bartos.
1. The noncompete agreements. In or about November 2000, one of Hammett’s competitors, School Specialty, Inc. (“SSI”), offered to purchase Hammett’s K-12 public school business. Dubin worked as the primary negotiator for the sale. During negotiations, SSI’s president, David VanderZanden (“VanderZanden”), insisted that Richmond and Jeffrey be subject to a five-year noncompete agreement as part of the deal. According to VanderZanden, these noncompete agreements were an “absolute requirement for the transaction ... to be completed.” As compensation for the noncompete agreements, Richmond and Jeffrey would receive approximately $2,750,000 in compensation. On November 2, 2000, Richmond caused a “special notice of meeting of stockholders” to be sent to Hammett shareholders.
On November 6, 2000, Richmond sent a letter outlining the terms of the sale to Clay and Bartos. The letter stated that the price of the sale would be “[approximately $81,275,000 to purchase a significant portion of the business—subject to change due to any closing adjustments.” It also stated that “(t]he company, along with two of its key management personnel will be restricted for a period of five (5) years from competing in the specific areas being sold.” An enclosure sent with the letter identified the total sale price as $81,275,700, with $2,748,500 allotted to a “non-compete,” leaving a sales price of $78,527,300.
Shortly after the Clay received the letter, Richmond contacted him by telephone to discuss the sale in further detail. This conversation took place before the shareholder vote on November 22, 2000. During the discussion, Richmond told Clay about the non-compete compensation that would be paid to himself and Jeffrey. Specifically, he said he and Clay “talked about the noncompetes; [I] outlined with him that there was a five-year noncompete that was being requested of Jeff and myself and that there was a compensation number related to that.” Richmond “pointed . . . out to” Clay what the compensation amount would be.
In addition, Richmond contacted Bartos by telephone shortly before the shareholder meeting to discuss the sale with her. He told her about the noncompete agreements and specifically stated that “there was an amount that [he and Jeffrey] were going to be compensated for [the] noncompete.” He disclosed the specific amount of such compensation to Bartos.
On November 22, 2000, Hammett’s stockholders, including Clay and Bartos, voted unanimously to approve the sale.
2. The bonus payments. On October 31, 2000, the Hammett board of directors voted to award extra compensation to all members involved with the sale to SSI. Richmond, Jeffrey, Olson, and Dubin each received bonuses as a result of that decision. Richmond and Jeffrey each received a bonus of $1,123,765.00, and Olson and Dubin each received a bonus of $1,000,000.00.
The shareholders were not consulted in this decision. They were not specifically told about the bonuses and they were not given the opportunity to vote on or otherwise approve them. Richmond explained that Hammett’s long-standing policy was not to involve shareholders in employee compensation decisions.
This action was instituted on June 14, 2006.
DISCUSSION
1. Standard. The familiar standard governing motions for summary judgment provides that summaiy judgment shall be granted forthwith where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r of Corr., 390 Mass. 419, 423 (1983). In assessing the record on a motion for summaiy judgment, all reasonable inferences are drawn in favor of the nonmoving party. Terra Nova v. Fray-Witzer, 449 Mass. 406, 411 (2007).
*406 2. The noncompete payments. The plaintiffs maintain that they were not told of the noncompete payments to Richmond and Jeffrey. They further contend that the defendants had an obligation to provide them with this information, as the noncompete payments were part of the terms of the sale to SSI and, had Clay and Bartos known about them, they might have voted differently on the sale at the November 22, 2000 shareholders meeting.
The plaintiffs’ claim is barred by the statute of limitations. Richmond’s uncontroverted deposition testimony, set forth above, unequivocally establishes that he initiated conversations with both Clay and Bartos in November 2000, during which they discussed the noncompete payments. Richmond testified under oath that he informed both Clay and Bartos about the existence and the amounts of the non-compete payments.[5]
Therefore, Clay and Bartos were on notice in November 2000 of facts sufficient to inform them of their claims against the defendants.[6] The limitations period of three years, see G.L.c. 260, §2A, began to run in 2000. This action, commenced in 2006, falls outside the limitations period and is thus time-barred.
3. The bonus payments. The plaintiffs argue that the bonus payments awarded to the defendants should have been disclosed to them before the shareholder vote of November 22, 2000, because information concerning the bonus payments may have affected their decision to vote to approve the sale.
Shareholders in close corporations owe a fiduciary duly to act with the “utmost good faith and loyalty” to one another. Zimmerman v. Bogoff, 402 Mass. 650, 657 (1988). However, such a duty “is not intended to place a straitjacket on legitimate corporate activity.” Id. “The majority interests in a close corporation must have a large measure of discretion with respect to corporate governance, including . . . establishing the salaries of corporate officers . . .” Holland v. Burke, Civil Action No. 05-0122, 2008 WL 4514664 *4, (Mass.Super.Ct. June 18, 2008) (Connon, J.) [24 Mass. L. Rptr. 551).
Accordingly, the “salaries of a corporate officer [are] a legitimate business purpose protected by the business judgment rule.” Pulsifer v. Butnaru, Civil Action No. 03-3374, 2006 WL 3008518 *4 (Mass.Super.Ct. Aug. 17, 2006) (Macdonald, J.). The plaintiffs point to no facts in the summary judgment record that would overcome the presumption of reasonableness accompanying the business judgment rule. Indeed the plaintiffs’ own expert acknowledges that the bonus payments did not exceed amounts customarily paid in connection with corporate transactions of this magnitude. Thus, especially in light of the defendants’ many years of service to Hammett, there is no genuine issue of material fact concerning the reasonableness of the bonus payments. Compare Charlette v. Charlette Bros. Foundry, Inc., 59 Mass.App.Ct. 34, 43 (2003) (large corporate profits justified decision to award high compensation to “senior and . . . experienced employee”).
CONCLUSION AND ORDER
For the foregoing reasons, the defendants’ Motion for Summary Judgment is, in all respects, ALLOWED.

The named plaintiffs in this action, Rick Clay and Paul A. Bartos, bring claims on behalf of the estates of Clay and Bartos. Clay died in 2004, and Bartos died in 2008. For ease of reference, the court will refer to the present parties in this action as simply “the plaintiffs," but will refer to Clay and Bartos by name when referencing the facts from which the litigation arises.

he plaintiffs argue that other details in the summary judgment record cast doubt on the accuracy of Richmond’s memory of his telephone conversations with Clay and Bartos. These contentions do not create a genuine issue of material fact.

As noted above, Clay and Bartos were also advised of the noncompete payments in writing by Richmond on November 6, 2000.